UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

```
LAS VEGAS SANDS CORP., and      :
LAS VEGAS SANDS, LLC,           :     HONORABLE JOSEPH E. IRENAS
                                :
          Plaintiffs,           :
                                : CIVIL ACTION NO. 06-5441 (JEI/JS)
     v.                         :
                                :
ACE GAMING, LLC, and            :              OPINION
ATLANTIC COAST ENTERTAINMENT    :
HOLDINGS, INC.,                 :
                                :
          Defendants.           :
```

**APPEARANCES:**

DUANE MORRIS LLP
By:  Steven Friedman, Esq.
     Sheila Raftery Wiggins, Esq.
     John T. Crutchlow, Esq.
744 Broad Street, Suite 1200
Newark, New Jersey 07102
     Counsel for Plaintiffs Las Vegas Sands Corp. and Las Vegas
     Sands, LLC

SILLS CUMMIS EPSTEIN & GROSS P.C.
By:  Kenneth F. Oettle, Esq.
One Riverfront Plaza
Newark, New Jersey 07102

and

BRIOL & ASSOCIATES PLLC
By:  Mark J. Briol, Esq.
     William G. Carpenter, Esq.
3700 IDS Center
80 South Eighth Street
Minneapolis, Minnesota 55402
     Counsel for Defendant ACE Gaming, LLC

STERNS & WEINROTH
By:  Marshall D. Bilder, Esq.
     Jason S. Feinstein, Esq.
50 West State Street, Suite 1400
Trenton, New Jersey 08607
     Counsel for Defendant Atlantic Coast Entertainment Holdings,
     Inc.

**IRENAS**, Senior District Judge:

This is a diversity breach of contract suit.[1]  The contract at issue is the "SANDS" trademark "License Agreement" between Las Vegas Sands, Inc.[2] and Greate Bay Hotel and Casino, Inc. ("Greate Bay")[3], predecessor in interest to Defendant ACE Gaming, LLC ("ACE").  Defendant Atlantic Coast Entertainment Holdings, Inc. ("Atlantic"), is the parent holding company of ACE.

Each party has moved for summary judgment.  For the reasons stated herein: (1) Las Vegas Sands' motion for summary judgment against ACE will be granted; ACE's cross-motion will be denied; and (2) Las Vegas Sands' motion for summary judgment against Atlantic will be denied; Atlantic's cross-motion will be granted.  Specifically, the Court holds that the License Agreement's termination fee is not an unenforceable penalty under Nevada law; ACE breached the License Agreement by failing to include the Madison House revenues in its royalty fee calculation; Las Vegas

---

[1]  This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332.

[2]  After the License Agreement was signed, but prior to this suit, Las Vegas Sands, Inc. converted to an LLC.  Thus, Las Vegas Sands, LLC is the Plaintiff.  Las Vegas Sands Corp. is also a Plaintiff, presumably because LLC assigned its trademark registration to Corp. in July, 2005.  For the purposes of this Opinion, distinguishing between the various Las Vegas Sands corporate entities is not necessary.

[3]  Greate Bay was initially named as a defendant to this suit, but Plaintiffs later voluntarily dismissed their claims against Greate Bay.

2

Sands did not breach the License Agreement, either by terminating the License Agreement, or taking steps toward opening a Sands casino in Bethlehem, Pennsylvania; and Atlantic may not be held liable for ACE's breach under either an alter ego or agency theory.

## I.

In the License Agreement, executed on July 14, 2004, Las Vegas Sands granted Greate Bay, and subsequently ACE[4], a license to use the "SANDS" trademark at the Atlantic City Sands Hotel and Casino.  (License Agreement, Amend. Compl. Ex. A)  In exchange, ACE agreed to make royalty payments.  (Id.)  The term of the agreement extended to May 19, 2086.  (Id.)  The agreement's exclusive area extended to Atlantic City's city limits.  (Id.) The specific terms relevant to the present disputes will be discussed at length *infra.*

The parties' disputes began around the time when Defendant Atlantic and Pinnacle Entertainment, Inc. ("Pinnacle") announced, on September 5, 2006, that they had "signed a definitive agreement under which Pinnacle agreed to purchase the entities that own The Sands [(including ACE)] . . . in Atlantic City, [New

---

[4]  Eight days after the License Agreement was signed, Greate Bay assigned its rights to ACE.  (Supp. Carpenter Cert. Ex. 3) For convenience, the Court will not continue to distinguish between Greate Bay and ACE, using simply "ACE" to refer to Greate Bay and/or ACE.

Jersey]." (Crutchlow Cert. Ex. 36)  Pinnacle's press release

announcing the deal made clear Pinnacle's intentions for the

Sands Hotel and Casino:

> Pinnacle plans to build an entirely new casino and
> hotel on the site, which would be among the largest
> and most spectacular resorts in the region.

> As part of the [sale] agreement, Pinnacle required
> that the sellers proceed to close the existing [Sands]
> hotel-casino. . . . The closure will facilitate the
> construction of a new, much larger facility as quickly
> as possible.

(Id.)  It is undisputed that the Atlantic City Sands Hotel and

Casino permanently terminated operations on November 11, 2006.

The ACE-Pinnacle transaction closed on November 17, 2006.  The

Atlantic City Sands was subsequently demolished.

Around the time of the Pinnacle announcement, Las Vegas

Sands invoked its right under the License Agreement to audit

ACE's books, records, and accounts with respect to the

computation of royalties.  (Crutchlow Cert. Ex. 37)

PriceWaterhouseCoopers LLC conducted the audit, and concluded

that ACE had underpaid royalties for the period of January 2001[5]

through June 2006 because it had excluded the rooms contained in

the Madison House-- a historic building attached to the Sands,

---

[5]   Pursuant to License Agreement ¶ 3, "all royalty payments
. . . made by Licensee to Licensor between January 1, 2001 and
the date hereof [July 14, 2004] shall be deemed to have been made
under this Agreement."  (Amend. Compl. Ex. A)

and also operated by ACE-- in the royalty calculations.[6]

(Crutchlow Cert. Ex. 35)

On November 14, 2006-- three days after the Sands shutdown, and three days before the ACE-Pinnacle closing-- Las Vegas Sands sent ACE a formal termination letter:

> Pursuant to ¶ 11 of the License Agreement regarding termination, please be advised that [Las Vegas Sands] hereby terminates the License Agreement . . . for (a) failure by the Licensee, ACE, to pay licensing fees due under the agreement going back several years based on the licensee's unlawful exclusion of the Madison House rooms for the calculation of the monthly royalties under ¶ 4; (b) based on the licensee, ACE's announced termination of all operations at the location effective November 11, 2006 and the announced demolition of the hotel and casino . . .
>
> . . .
>
> As you are well aware, [ACE] owes not only royalty payments in default under ¶ 4, but also the termination fees due under ¶ 11c of the Agreement. . .

(Crutchlow Cert. Ex. 37)

This suit followed.  The Amended Complaint asserts seven counts: (1) declaratory judgment that the License Agreement is terminated; (2) anticipatory breach of the License Agreement; (3) breach of contract by failing to pay termination fees; (4) breach of contract by underpaying royalties-- by excluding the Madison

---

[6]  ACE began leasing and operating the Madison House in December, 2000.  (ACE's Response to Pls' Statement of Undisputed Facts ("SUF") ¶ 53)
As discussed further *infra*, under the License Agreement, royalty payments were based upon ACE's gross room revenues.

House from the royalty calculations; (5) breach of contract by
underpaying royalties-- by undervaluing "comped" rooms when
making the royalty calculations[7]; (6) recovery of books and
records inspection fees due under the contract[8]; and (7) unjust
enrichment.  Las Vegas Sands seeks recovery on all claims against
both ACE and Atlantic: against ACE as a party to the License
Agreement; and against Atlantic (ACE's parent holding company) on
corporate veil piercing and agency theories.

As previously noted, both Defendants, ACE and Atlantic, have
moved for summary judgment.  Las Vegas Sands has cross-moved
against both Defendants for summary judgment on Counts 3
(termination fees), 4 (royalty calculation-- Madison House), 6
(inspection fees) and 7 (unjust enrichment).

## II.

"[S]ummary judgment is proper 'if the pleadings,
depositions, answers to interrogatories, and admissions on file,
together with the affidavits, if any, show that there is no
genuine issue as to any material fact and that the moving party

---

[7]  Count Five was dismissed by the parties' stipulation on
January 9, 2009.

[8]  Count 6 is linked to the royalties claims.  The License
Agreement provides that if the royalty calculations are off by
more than 1% (in favor of the licensee), Las Vegas Sands is
entitled to recover the "professional fees" associated with
determining that there was an error.  Las Vegas Sands alleges
those fees "exceed $60,000." (Amend. Compl. ¶ 69)

is entitled to a judgment as a matter of law.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. P. 56(c)).  In deciding a motion for summary judgment, the Court must construe the facts and inferences in a light most favorable to the non-moving party. *Pollock v. Am. Tel. & Tel. Long Lines*, 794 F.2d 860, 864 (3d Cir. 1986).  The role of the Court is not "to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

The summary judgment standard is not affected when the parties file cross-motions for summary judgment. *See Appelmans v. City of Phila.*, 826 F.2d 214, 216 (3d Cir. 1987).  Such motions "'are no more than a claim by each side that it alone is entitled to summary judgment, and the making of such inherently contradictory claims does not constitute an agreement that if one is rejected the other is necessarily justified or that the losing party waives judicial consideration and determination whether genuine issues of material fact exist.'" *Transportes Ferreos de Venez. II CA v. NKK Corp.*, 239 F.3d 555, 560 (3d Cir. 2001) (quoting *Rains v. Cascade Indus., Inc.*, 402 F.2d 241, 245 (3d Cir. 1968)).  If after review of cross-motions for summary judgment the record reveals no genuine issues of material fact, then judgment will be entered in favor of the deserving party in light of the law and undisputed facts. *Iberia Foods Corp. v.*

*Romeo*, 150 F.3d 298, 302 (3d Cir. 1998).

### III.

The Court first addresses ACE's motion for summary judgment and Las Vegas Sands' corresponding cross-motion, and then turns to Atlantic's motion and Las Vegas Sands' corresponding cross-motion.

### A.  Las Vegas Sands - ACE Motions

### 1.

With regard to Las Vegas Sands' claim for termination fees (Count 3), ACE argues that the termination fee clause is an unenforceable liquidated damages clause (i.e., penalty) under Nevada law;[9] and even if the clause is enforceable, ACE's failure to pay termination fees is excused as a matter of law by Las Vegas Sands' breaches of the License Agreement.

*a.   Is the termination fee clause enforceable?*

Las Vegas Sands seeks to recover termination fees pursuant to paragraph 11(c) of the agreement, which states:

    11.   <u>Termination</u>

---

[9]   The License Agreement states that it shall be "governed by and construed in accordance with the laws of Nevada."  (Amend. Compl. Ex. A, ¶ 14)  The parties agree that Nevada law governs this issue.

(a) Notwithstanding any other provision of this Agreement, each party shall have the right to terminate this Agreement on seven (7) days prior written notice to the other in the event such other party shall cause, commit or suffer to exist with respect to it any of the following:

    (i)  . . .  a material breach of this Agreement, which is not cured within twenty (20) days after the breaching party receives written notice thereof, specifying the failure in reasonable detail;

. . .

(b) Additionally, . . . Licensor shall have the right to terminate this Agreement on seven (7) days prior written notice to Licensee in the event that Licensee shall cause, commit or suffer to exist with respect to the Licensee any of the following:

. . .

    (ii) if Licensee suspends normal business operations at any Location for a continuous period of sixty (60) days or more . . .

. . .

(c) If this Agreement is terminated by Licensor in accordance with the provisions of this Section 11 at any time prior to the fourteenth (14th) anniversary of the Start Date, . . . *Licensee shall remain liable . . . for all Fees[10] and other charges Licensee would have been required to pay to Licensor under this Agreement to and including the fourteenth (14th) anniversary of the Start Date, plus a termination fee ("Involuntary Termination Fee") equal to (i) the Fee for the three (3) immediately prior full calendar years preceding the year of termination divided by (ii) 3. . . .*

(d) Notwithstanding anything contained in this

---

[10]  Under ¶ 3 of the License Agreement, "Fees" are royalty payments, calculated as "three percent (3%) of the Gross Room Charges at [the Sands Hotel and Casino] for the then-current year." Fees were paid on a monthly basis pursuant to ¶ 4 of the agreement.

> Agreement to the contrary, if this Agreement is
> terminated by Licensor in accordance with the
> provisions of Section 11 above, either Licensee or
> Licensor may elect, by written notice to the other .
> . . that Licensee, in lieu of making the payments set
> forth in Section 11(c) above over the balance of the
> Term, shall pay Licensor an amount equal to (i) all
> Fees and other accrued liabilities under this
> Agreement, plus (ii) all Fees and other charges that
> Licensee would have been required to pay to Licensor
> under this Agreement from the date of termination to
> an including the fourteenth (14th) anniversary of the
> Start Date . . . , plus (iii) the Involuntary
> Termination Fee, with the amounts described in
> Sections 11(d)(ii) and (ii) [sic] being discounted to
> present value at an annual interest factor of four
> percent (4%).

(Amend Compl. Ex. A) (emphasis added)

Las Vegas Sands asserts that the fee it seeks is not liquidated damages at all because, even absent a breach of the License Agreement, ACE is obligated to pay at least the fees due through the "14th anniversary of the Start Date" plus a one year termination fee. A careful reading of the License Agreement demonstrates that Las Vegas Sands is both factually and legally correct.

Paragraph 5 of the License Agreement provides, in relevant part,

> 5.   Term and Renewal
>
> (a) The term of this Agreement . . . shall commence
> upon the execution of this Agreement, and unless
> sooner terminated in accordance with the provisions of
> Section 5(b) or Section 11 hereof, shall continue
> until May 19, 2086 . . . provided that Licensee may
> terminate this Agreement . . . at any time *after* the
> fourteenth (14th) anniversary of the Start Date . . .

provided further that if the Licensee terminates this
Agreement any time after the fourteenth (14th)
anniversary of the start date and prior to May 19,
2086 Licensee shall . . . pay to Licensor (i) all
unpaid amounts for Fees (pro-rated for any partial
year) due under this Agreement . . . and (ii) a
termination fee ("Termination Fee") equal to the Fee
for the three immediately prior full calendar years,
divided by three (3). . . . This Agreement shall in
any event terminate on May 19, 2086 and, if this
Agreement is still in effect at such time, no
Termination Fee shall be payable by Licensee.

(b) Additionally, and notwithstanding any other
provision of this Agreement to the contrary, Licensee
shall have the right to terminate this Agreement at
any time *prior to* the fourteenth (14th) anniversary of
the Start Date . . . . In any such event, Licensee
shall pay to Licensor an amount equal to (i) all
unpaid amounts for Fees (pro-rated for any partial
year) due under this Agreement . . . plus (ii) all
Fees that Licensee would have been required to pay to
Licensor under this Agreement . . . to and including
the fourteenth (14th) anniversary of the Start Date,
discounted to present value at an annual interest
factor of four percent (4%), plus (iii) a Termination
Fee (as defined above). . . .

(Amend. Compl. Ex. A) (emphasis added)

Thus, reading paragraphs 5 and 11 together, it becomes clear

that under every possible termination scenario, ACE is obligated

to pay at least fees due through the "14th anniversary of the

Start Date" plus an additional one year of fees:

- If ACE elects to voluntarily terminate the agreement
  prior to the 14th anniversary of the Start Date, ACE
  owes fees due through the 14th anniversary of the Start
  Date, plus the one year "Termination Fee."  (License
  Agreement ¶ 5(b))

- If ACE elects to voluntarily terminate the agreement
  after the 14th anniversary of the Start Date, ACE has
  already paid at least the fees due through the 14th
  anniversary of the Start Date, and still owes the one

year "Termination Fee." (License Agreement ¶ 5(a))

- If Las Vegas Sands terminates the agreement prior to the 14th anniversary of the Start Date, ACE owes fees due through the 14th anniversary of the Start Date, plus the one year "Involuntary Termination Fee."[11] (License Agreement ¶ 11(c))

- If Las Vegas Sands terminates the agreement after the 14th anniversary of the Start Date, ACE has already paid at least the fees due through the 14th anniversary of the Start Date, and still owes the one year "Involuntary Termination Fee." (License Agreement ¶ 11(c))

- If neither party terminates the agreement, it automatically terminates on May 19, 2086, in which case ACE has already paid much more than fees due through the 14th anniversary of the Start Date plus an additional one year of fees. (License Agreement ¶ 5(a))[12]

Because ACE agreed to pay at least the fees due through the 14th anniversary of the Start Date plus an additional year of fees even absent its breach of the agreement, the termination fee Las Vegas Sands seeks is simply not liquidated damages. "Liquidated damages are the sum which a party to a contract agrees to pay if he fails to perform." *Mason v. Fakhimi,* 109

---

[11]  The "Termination Fee" and the "Involuntary Termination Fee" are, by definition, the same.  (See License Agreement ¶¶ 5(a) and 11(c))

[12]  Of course the agreement would also terminate upon Las Vegas Sands' material breach of the agreement but in that scenario ACE would be excused from further performing under the contract.  *See Young Elec. Sign Co. v. Fohrman*, 86 Nev. 185, 188 (1970) (stating that one party's material breach excuses the other party's further performance under the contract).

Nev. 1153, 1156 (1993).[13]  Indeed, the sum Las Vegas Sands seeks is not damages at all; it is the fee ACE agreed to pay under the License Agreement.  Las Vegas Sands is correct in concluding that ACE's payment of the termination fee is a means of performance, even though ACE's obligation to pay the fee happens to arise, under the specific facts presented here, upon ACE's breach.[14]

This result makes sense considering the nature of the licensed mark.  Undisputedly, the Sands name was well-established in Atlantic City[15], and the mark was used in the very limited market for casino gambling.  By granting to ACE an exclusive license in Atlantic City, Las Vegas Sands ran the risk of being effectively excluded from the Atlantic City market if ACE, for whatever reason, discontinued use of the Sands mark.  By establishing a 14 year (plus one) minimum payment under all circumstances, the License Agreement provides some financial

---

[13]  *See also* Black's Law Dictionary (8th Ed. 2004) (defining "liquidated-damages clause" as "[a] contractual provision that determines in advance the measure of damages if a party breaches the agreement."); 11-58 Corbin on Contracts § 58.1 ("While parties are not empowered to provide for penalties in the event of a breach, they can under certain conditions determine in advance what damages will be assessed in the event of a breach. Such a provision is known as a liquidated damages clause.").

[14]  Indeed, even if this Court were to hold that ACE did not breach the License Agreement, Las Vegas Sands is still entitled to the termination fee pursuant to License Agreement ¶ 11(b)(ii), because ACE permanently suspended business operations at the Atlantic City Sands.

[15]  The record indicates the Sands mark was licensed in Atlantic City at least as far back as 1981.  (Crutchlow Ex. 2)

13

protection to Las Vegas Sands even in the event that ACE simply elected to stop using the Sands mark.  Such a decision by ACE would not breach the License Agreement-- the agreement grants ACE the *right* to use the mark; it does not *require* that ACE use the mark-- but would nevertheless have significant negative consequences for Las Vegas Sands.

Accordingly, the Court holds that the termination fee Las Vegas Sands seeks to recover is not a liquidated damages clause. Therefore, in cannot be an unenforceable penalty under Nevada law.  ACE's motion for summary judgment on this issue will be denied.

b.   *Did Las Vegas Sands breach the agreement by terminating the License Agreement on November 14, 2006?*

ACE asserts that Las Vegas Sands breached Section 11(b)(ii) of the License Agreement, which only allowed Las Vegas Sands to terminate the agreement if ACE had suspended operations for 60 days or more.[16]  Because the undisputed facts demonstrate that Las Vegas Sands terminated the Agreement only three days after the Atlantic City Sands shutdown, ACE claims Las Vegas Sands breached the agreement.

---

[16]   The License Agreement states, "Licensor shall have the right to terminate this Agreement . . . if Licensee suspends normal business operations at any Location for a continuous period of sixty (60) days or more. . . ."  (Amend. Compl. Ex. A, ¶ 11(b)(ii))

ACE's argument fails for two independent reasons.  First, the undisputed evidence unequivocally demonstrates that when the Atlantic City Sands shutdown on November 11, 2006, the shutdown was permanent, i.e., for a continuous period of more than 60 days.  In addition to Pinnacle's press release explicitly stating that the closure was permanent, prior to the shutdown, ACE had already advised its employees in writing that it "will close the Hotel . . . for a period in excess of twelve (12) months" (Crutchlow Ex. 49), and ACE had surrendered its casino license to the New Jersey Casino Control Commission (Crutchlow Ex. 50).  On the day Las Vegas Sands terminated the License Agreement, both parties to the agreement knew that the Sands had closed permanently, which is obviously longer than 60 continuous days. This Court will not hold that Las Vegas Sands breached the License Agreement merely because it did not wait 60 days from the day of the Sands' permanent closure to send the termination letter.

Second, as explained *infra*, ACE breached the License Agreement first, when it failed to include the Madison House rooms in its royalty calculations.  This breach has two implications: (1) ACE's breach excused Las Vegas Sands from further performing under the License Agreement, therefore Las Vegas Sands could not, as a matter of law, have breached the

agreement by terminating the agreement on November 14, 2006[17];
and (2) as the License Agreement itself states, ACE's material
breach was an independent ground for immediate termination of the
License Agreement.

Accordingly, this Court holds that Las Vegas Sands did not
breach the License Agreement by sending the termination letter on
November 14, 2006.  ACE's motion for summary judgment will be
denied.


c.   *Did Las Vegas Sands breach the agreement by taking steps
     towards opening a Sands casino in Bethlehem, Pennsylvania?*

ACE also asserts that Las Vegas Sands breached the License
Agreement by taking steps toward opening a Sands casino in
Bethlehem, Pennsylvania.[18]  It is undisputed that Las Vegas Sands
registered the domain name "SandsBethworks.com" in October, 2005;
under the name "Sands Bethworks Gaming, LLC," applied to the
Pennsylvania Gaming Control Board (PGCB) for a gaming license in
December 2005; and launched an informational web page about

---

[17]   *See Bradley v. Nevada C. O. R. Ry.*, 42 Nev. 411, 421-22
(1919) ("If there is anything well settled, it is that the party
who commits the first breach of the contract cannot maintain an
action against the other for a subsequent failure to perform.");
*see also Young Elec. Sign Co.*, 86 Nev. at 188 (stating that one
party's material breach excuses the other party's further
performance under the contract).

[18]   It is undisputed that the Sands casino in Bethlehem did
not actually open for business until May 22, 2009-- more than two
years after the Atlantic City Sands permanently closed.

"Sands Bethworks" in April, 2006.

According to ACE, these actions breached paragraph 2(a)(iv) of the License Agreement, and the implied covenant of good faith and fair dealing, because the License Agreement prohibited Las Vegas Sands from competing with ACE in the New York - New Jersey - Pennsylvania market. Each argument is addressed in turn.

*Paragraph 2(a)(iv) of the License Agreement*

The relevant portion of the agreement reads:

2.   <u>Grant of License.</u>

(a) Licensor hereby grants to Licensee, for the duration of the Term, the right and exclusive license, solely in connection with Business Activities conducted in the Exclusive Area, to: . . . (iv) use the Trademark . . . in connection with incidental activities related to and customarily conducted in connection with the maintenance, promotion and/or operation of a Hotel and/or casino, whether within or without the Exclusive Area, so long as such use is (i) designed to support, enhance and/or benefit, relates to the advertising or promotion of, or otherwise relates to the operation of the Business Activities within the Exclusive Area; (ii) is of limited duration and (iii) is conducted within a 350 mile radius of the Existing Location. The foregoing license includes the right to use the Trademark in connection with advertising and promotion of the Business Activities in any media using any technology . . . whether such advertising . . . occurs within or without the Exclusive Area; provided, however, that any such advertising and promotion that is placed in any media that is outside of, or is designed or intended to reach recipients beyond the New York City-New Jersey-Philadelphia region shall expressly identify that the Hotel and casino services are conducted within the Exclusive Area.

(Amend. Compl. Ex. A)

17

Before turning to the parties' arguments, it is helpful to specifically parse what ACE is, and is not, arguing with respect to this clause.  Contrary to Las Vegas Sands' contentions, ACE is *not* arguing that Paragraph 2(a)(iv) precluded Las Vegas Sands from constructing and operating a Sands casino in Bethlehem; ACE reserves that argument for its breach of the duty of good faith and fair dealing claim, discussed *infra.*  ACE *does* seem to assert the following with respect to Paragraph 2(a)(iv): (1) that the clause grants it an exclusive right to use the Sands mark "within the New York - New Jersey - Philadelphia market out to 350 miles from Atlantic City." (ACE's Moving Brief p. 32); therefore any other party's (i.e., Las Vegas Sands') use of the mark "in connection with incidental activities related to and customarily conducted in connection with the maintenance, promotion and/or operation of a Hotel and/or casino" within that 350-mile radius is prohibited by the License Agreement; and (2) that the clause granted it an "exclusive right to advertise *a* Sands casino within the New York - New Jersey - Philadelphia market out to 350 miles from Atlantic City" (ACE's Moving Brief p. 32) (emphasis added); therefore any advertising of a Sands casino within the 350-mile radius is prohibited by the License Agreement.

Both of these arguments, however, are an overly broad interpretation of the clause at issue.  The first sentence of the "Grant of License" is clear: Las Vegas Sands granted ACE an

18

"exclusive license, *solely in connection with Business Activities conducted in the Exclusive Area."* And subparagraph 2(a)(iv) itself grants ACE rights to use within a 350 mile radius of the Existing Location "*so long as* such use . . . relates to *the operation of Business Activities within the Exclusive Area."* Thus, Las Vegas Sands granted ACE an exclusive license to use the Sands mark and advertise *but only insofar as* that use of the mark and advertising relates to, or is connected with, the Atlantic City Sands.  Contrary to ACE's arguments, Paragraph 2(a)(iv) does not grant ACE an exclusive license to use the Sands mark in connection with, or advertise, a Sands casino located outside of Atlantic City; nor does it prohibit Las Vegas Sands from doing so.

Moreover, as Las Vegas Sands observes, ACE's expansive interpretation conflicts with the other terms of the License Agreement, which clearly limit the agreement's "Exclusive Area" to "the city limits of Atlantic City, New Jersey."  (Amend. Compl. Ex. A, ¶ 1(e))  Specifically, Las Vegas Sands "reserve[d] any and all rights not expressly and explicitly granted in th[e] Agreement, including [its] right to use, and to authorize or license use of the Trademark . . . to any Person or Persons anywhere in the world, other than for Business Activities conducted at Locations in the Exclusive Area."  (Id. ¶ 2(d))  As this clause clearly demonstrates, the 350-mile clause was

19

intended to expand ACE's right to use the Sands mark for advertising outside of Atlantic City; the clause was not intended as a restriction of Las Vegas Sands' rights with respect to the mark.[19]

*Implied covenant of good faith and fair dealing*

ACE next argues that Las Vegas Sands "breached the implied covenant of good faith and fair dealing by competing with their own licensee." (ACE's Moving Brief, p. 25)  ACE elaborates, "[Las Vegas Sands'] aggressive attack on the Atlantic City market, which began while the [Atlantic City] Sands was still operating and still paying royalties for use of the Sands trademark, contravened the intention and spirit of the License Agreement." (Id., p. 28)

"[A]ll contracts impose upon the parties an implied covenant of good faith and fair dealing, which prohibits arbitrary or unfair acts by one party that work to the disadvantage of the other." *Nelson v. Heer,* 123 Nev. 217, 226 (2007).

The Court holds that no reasonable factfinder could conclude on this record that Las Vegas Sands acted in bad faith or

---

[19]  Alternatively, even assuming arguendo that Las Vegas Sands' conduct did breach the License Agreement, ACE's motion for summary judgment on this issue would have to be denied, and Las Vegas Sands' corresponding motion would have to be granted, because, as explained *infra*, ACE breached the License Agreement first, by failing to pay the correct amount of royalties.

unfairly disadvantaged ACE by taking steps toward opening a Sands
casino in Bethlehem.  The License Agreement granted ACE the
exclusive right to use the Sands mark in Atlantic City, New
Jersey; and to a limited extent, use the mark within a 350-mile
radius of Atlantic City so long as that use was connected to the
Atlantic City Sands.  No reasonable factfinder could conclude
that applying for a casino license, and promoting a future Sands
casino in Bethlehem, Pennsylvania undermined ACE's exclusive
rights in Atlantic City.  Contrary to ACE's assertions, nothing
in the License Agreement guaranteed that ACE would be free from
competition outside of Atlantic City; therefore, assuming without
deciding that Las Vegas Sands did "compete" with ACE[20], those
actions could not have unfairly disadvantaged ACE.[21]

As the Court observed at oral argument, to adopt ACE's
proposed interpretation would be to hold that the License
Agreement precluded Las Vegas Sands from opening a casino in any
location where potential Atlantic City Sands patrons might choose
to gamble-- other New Jersey locations, New York, Pennsylvania,

---

[20]  Las Vegas Sands notes that the Bethlehem Sands and the
Atlantic City Sands were never open for business at the same
time.  Therefore, Las Vegas Sands argues, there could be no
competition, in the sense that prospective casino patrons were
never choosing between visiting the Bethlehem Sands and the
Atlantic City Sands.

[21]  It is also worth noting that at least in some respects, a
disadvantage to ACE would have also been a disadvantage to Las
Vegas Sands, because ACE's royalty payments to Las Vegas Sands
were based on ACE's gross room revenues.

Connecticut, or Delaware, to name just a few.  Such a huge
restriction on Las Vegas Sands' right to use its own mark is not
consistent with the facts of this case or the License Agreement
as a whole.

In conclusion, with regard to Count 3 of the Amended
Complaint, the Court holds that Las Vegas Sands is entitled to
termination fees as provided for in the License Agreement
because: (a) the termination fee is not an unenforceable penalty;
and (b) Las Vegas Sands did not breach the License Agreement (or,
alternatively, even if Las Vegas Sands did breach the agreement,
the breach was excused by ACE's earlier breach).  Accordingly, as
to the claim for termination fees, ACE's motion for summary
judgment will be denied and Las Vegas Sands' corresponding motion
for summary judgment will be granted.

### 2.

With regard to Las Vegas Sands' breach of contract claim for
additional royalties from the Madison House rooms (Count 4), the
parties disagree as to whether the Madison House operated under
the Sands mark.

The License Agreement provides that ACE shall pay royalties
in the amount of "three percent (3%) of the Gross Room Charges *at
the Location* for the then-current year."  (Amend. Compl. Ex. A ¶
3(b)) (emphasis added)  "'Location' means *a Hotel* owned or

22

operated by [ACE]."  (Id. ¶ 1(h)) (emphasis added) "'Hotel' means one or more physical buildings containing at least five hundred (500) qualifying sleeping units, as defined in Section 27 of the [New Jersey] 'Casino Control Act' . . . operated under the [Sands] Trademark and used in conjunction with the operation of a casino in Atlantic City."  (Id. ¶ 1(g))

ACE argues that the Madison House was not operated under the Sands mark and not used in conjunction with the operation of a casino, therefore, its rooms were properly excluded from the Gross Room Charges used to compute royalties.  On the other hand, Las Vegas Sands asserts that the Madison House was part of the Sands Hotel and Casino complex and did, indeed, operate under the Sands mark, in conjunction with the Sands casino.

The following facts are undisputed.  The Madison House was its own, stand alone building.[22]  It was a distinctive historical building that, from the outside, looked completely different from the Sands Hotel and Casino-- the Madison House had a red brick facade; the Sands Hotel and Casino had a modern white facade. (Cruchlow Cert. Ex. 9)  But the Madison House was physically connected to the Sands parking garage in two places: on the ground floors of the two buildings, and at an elevated linkway connecting the third floor of the Sands' Valet Park Garage with

---

[22]  The Madison House no longer exists.  It was demolished along with the Sands Hotel and Casino.

the fifth floor of the Madison Hotel.  (ACE's response to Las Vegas Sands' SUF ¶ 72; Crutchlow Cert. Ex. 9)  A trademarked "Sands" sign stood in front of the Madison Hotel building and another large Sands logo appeared on the linkway between the buildings. (Crutchlow Cert. Ex. 9)  But the sign atop the Madison Hotel building said "Madison Hotel," not "Sands." (Id.)

ACE managed and operated the Madison Hotel pursuant to a lease agreement.  ACE admits that it "entered into the [l]ease, in part, to be able to enlarge its [Sands] casino floor."  (ACE's response to Las Vegas Sands' SUF ¶ 54)[23]  Indeed, in applying to the Casino Control Commission ("CCC") to expand the square footage of the Sands casino, in 2001, ACE asked the CCC to deem the Madison House part of the Sands.  ACE's petition stated:

> The Madison is attached to the Sands complex through entrances at the ground floor of the Madison to the ground floor of the Sands Valet Park Garage and at the fifth floor of the Madison hotel tower to the third floor of the Valet Park Garage at a point on the pedestrian walkway . . . .
>
> The connection at the ground floor allows customers to freely pass from Sands owned property into the hotel lobby of the Madison[,] and the connection at the third floor of the Valet Park Garage to the fifth floor of the Madison hotel tower allows customers to freely pass into and from the Madison . . . through an entrance controlled by the use of room keys for the Madison.
>
> Based on these connections, this Honorable Commission

---

[23]  In Atlantic City, a casino's maximum square footage is directly tied to the number of hotel rooms available for guests (i.e., "qualified sleeping units")-- the more hotel rooms, the larger the casino can be.  N.J.S.A. 5:12-83c.

> could find, and the Sands requests by this Petition . .
> . that the Commission does find, that the Madison is part
> of the Sands casino hotel. . . .

(Crutchlow Cert. Ex. 7)  The CCC granted ACE's petition, and by
virtue of including the Madison House rooms in the Sands'
qualified sleeping units, the Sands was allowed to expand its
casino by 10,000 square feet.  (Crutchlow Cert. Ex. 10, Crede
Dep. 163:1-10)

It is also undisputed that the operations of the Madison
Hotel and the Sands Hotel and Casino were "integrated" in many
respects: the Sands and the Madison Hotel shared a common
computer system, front desk administration, housekeeping,
reservations, and sales.  (ACE's response to Las Vegas Sands' SUF
¶ 56)  For example, a customer wishing to reserve a room at
either the Madison Hotel building or the Sands called the same
reservation telephone number: 1-800-AC-SANDS (Id. ¶ 66), and
patrons who gambled at the Sands casino were given complimentary
rooms at the Madison Hotel.  (Id. ¶ 70)  Similarly, the Sands
website, www.sandsac.com, promoted the Madison Hotel.  (Id. ¶ 67)

ACE also used the Madison Hotel to promote the Sands.  In a
series of press releases in August, 2004, the Sands announced,

> Sands Rediscovers the Madison House this Fall . . .
>
> The Sands Casino Hotel reinvents history as it reopens
> and repositions the newly renovated Madison House. . . .
>
> 'We want the public to rediscover the historic Madison
> House Suites at the Sands . . . . the Madison House mini-
> suites are a highly underutilized and undervalued Sands

> asset, . . . this newly renovated room product . . .
> continues to distinguish the Sands from its competitors
> in the Atlantic City market,' [Sands President George
> Toth said].

(Crutchlow Cert. Ex. 38)  This strategy of tying the Madison

House and the Sands together was intentional.  Sands internal

marketing documents show that ACE wanted to change the Madison

House logo to "tie [it] into the Sands."  (Id.)

Lastly, it is undisputed that ACE did not distinguish

between revenue received from the Madison Hotel and the Sands

when reporting hotel room revenue to either the Securities and

Exchange Commission or the CCC.  (ACE's response to Las Vegas

Sands' SUF ¶¶ 58-59)  Indeed, the record discloses that, with

regard to hotel room revenue totals, the only time ACE

distinguished between the Madison Hotel and the Sands was when it

calculated royalty payments due under the License Agreement.

A reasonable factfinder considering all of this undisputed

evidence could only reach one conclusion: the Madison Hotel was

operated under the Sands mark and used in conjunction with the

operation of the Sands Casino.  ACE argues that the Madison House

"was not presented and marketed under the Sands brand" (ACE's

Brief in Support of its Summary Judgment Motion, p. 39), but the

undisputed evidence demonstrates precisely the opposite.  The

Sands website promoted the Madison Hotel, Sands press releases

described the Madison Hotel as a "Sands asset" (Crutchlow Cert.

Ex. 38), and a trademarked Sands sign stood in front of the

Madison Hotel.  Contrary to ACE's assertions, a reasonable factfinder could not conclude that the Madison House merely operated along side the Sands Hotel and Casino.[24]  Accordingly, with respect to Count 4 of the Amended Complaint, ACE's motion for summary judgment will be denied and Las Vegas Sands' motion will be granted.

### 3.

Lastly, ACE does not dispute that if the Madison House rooms should have been included in the royalty calculations then Las

---

[24]  At oral argument, ACE observed that no Sands sign was physically affixed to the Madison Hotel building.  According to ACE, this evidence at least raises an issue of fact as to whether the Madison Hotel merely operated along side the Sands.  The Court is not persuaded by this argument.

The License Agreement refers to the Sands mark as the "Trademark," but it is probably a "service mark."  *See* 15 U.S.C. § 1127 (defining "service mark" as "any word, name, symbol, [etc.] . . . used by a person . . . to identify and distinguish the services of one person, including a unique service, from the services of others and to indicate the source of the services"; and defining "trademark" as "any word, name, symbol, [etc.] . . . used by a person . . . to identify and distinguish his or her goods, including a unique product, from those manufactured or sold by others and to indicate the source of the goods.")  While the distinction does not matter insofar as service marks have the same *legal* protection as trademarks, *see* 15 U.S.C. § 1053, *factually*, the distinction matters.  If ACE were selling a product that one might purchase off the shelf at a store, then the mark's physical absence on the product itself would be significant.  The Sands mark, however, identifies a particular casino experience-- primarily an intangible service, not a tangible good.  In this context, the absence of the Sands mark *on* the Madison House building is less significant, particularly in light of the undisputed fact that a Sands sign stands directly *in front of* the Madison House building, and on the linkway between the two buildings.

Vegas Sands is entitled to inspection fees (Count 6).
Accordingly, with regard to Count 6, ACE's motion for summary
judgment will be denied, and Las Vegas Sands' motion for summary
judgment will be granted.[25]

### B.  Las Vegas Sands - Atlantic Motions

Regarding the cross-motions between Las Vegas Sands and
Atlantic, Las Vegas Sands seeks to hold Atlantic, ACE's parent
holding company, liable for ACE's breach under an alter ego /
veil piercing theory and under an agency theory.

### 1.

*Choice of law*

With regard to piercing ACE's corporate veil, the Court
rejects Las Vegas Sands' assertion that, under New Jersey choice
of law rules[26], Nevada law applies because the License Agreement
selects Nevada law as the governing law.  While it is true that
New Jersey will usually honor contractual choice of law clauses,
the clause at issue simply does not extend to alter ego

---

[25]  Las Vegas Sands also moved for summary judgment on their
unjust enrichment claim (Count 7) but only as an alternative to
their breach of contract claims.  Because this Court holds that
Las Vegas Sands is entitled to judgment on Counts 3 and 4, Count
7 will be dismissed as moot.

[26]  This Court, sitting in diversity, applies New Jersey
choice of law rules.  *Klaxon v. Stentor Electric Mfg. Co.*, 313
U.S. 487 (1941).

liability.  Paragraph 14 of the License Agreement only states

that "*[t]his Agreement* shall be governed by and construed in

accordance with the laws of the State of Nevada. . . .".

(emphasis added).[27]

So the License Agreement's choice of law provision does not

answer the question of which law to apply.  In *D.R. Horton Inc.-*

*New Jersey v. Dynastar Development, LLC*, the court discussed two

possible methods of determining, under New Jersey law, which

state's law should govern veil-piercing.  No. MER-L-1808-00, 2005

WL 1939778 at *20-21 (N.J. Super. Law. Div. 2005).  A court

applying New Jersey law could either look to the target entity's

state of incorporation,[28] or conduct the flexible "governmental

interest analysis," where the court applies the law of the state

---

[27]  *Cf. Kalb, Voorhis & Co. v. Am. Fin.* Corp., 8 F.3d 130,
132 (2d Cir. 1993) (concluding that the choice of law provision
in the debentures at issue was "irrelevant" to determining which
state's law should govern the veil piercing analysis);  *Danton v.*
*Innovative Gaming Corp. of Am.,* 246 F. Supp. 2d 64, 72-73 (D. Me.
2003) ("The plaintiff contends that Nevada law applies to a
determination of the corporations' possible status as alter egos
for purposes of this court's jurisdictional analysis because the
note at issue specifies that it is to be construed in accordance
with Nevada law. . . . That term of the note, on its face,
applies only to construction of the note, which is not at issue
in connection with this motion to dismiss.").

[28]  *Cf. Stromberg Metal Works v. Press Mech.*, 77 F.3d 928,
933 (7th Cir. 1996) (applying Illinois choice of law rules and
observing, "[e]fforts to 'pierce the corporate veil' are governed
by the law of the state of incorporation.");  *Kalb, Voorhis &*
*Co.*, 8 F.3d at 132-33 (holding that under New York choice of law
rules, "[t]he law of the state of incorporation determines when
the corporate form will be disregarded.").

"'that has the most significant connections with the parties and the transaction.'" *Id.* at *21 (quoting *Boyson, Inc. v. Archer & Greiner, P.C.*, 308 N.J. Super. 287, 297 (App. Div. 1998)).[29]  In *Dynastar*, the Court concluded that it need not choose between the two methods of analysis, because the result was the same either way: New Jersey law applied.  *Id.*  For the reasons discussed next, this Court also holds that under either analysis, New Jersey law applies.

ACE's state of incorporation is New Jersey, thus if the Court were to choose the first option for determining the applicable law, New Jersey law would apply.

Alternatively, "the governmental-interest analysis seeks to determine the interest that each state has in resolving the specific issue in dispute.  That analysis requires the court to identify the governmental policies underlying the law of each state and how those policies are affected by each state's contacts to the litigation and to the parties." *Gantes*, 145 N.J. at 485 (internal citation and quotation omitted).[30]   First, New

---

[29]  *See also Gantes v. Kason Corp.*, 145 N.J. 478, 484 (1996) ("New Jersey's [choice-of-law] rule applies a flexible 'governmental-interest' standard, which requires application of the law of the state with the greatest interest in resolving the particular issue that is raised in the underlying litigation.").

[30]  The Court recognizes that the initial step in the governmental interest analysis is to determine whether there is a true conflict between the competing states' laws.  *See Gantes,* 145 N.J. at 485.  If the parties do not argue that a conflict exists, or the Court determines that no true conflict exists, New

Jersey, as the state where ACE is incorporated, has an interest in whether ACE's separate corporate form is recognized.  Second, Las Vegas Sands seeks to impose liability on Atlantic, a Delaware corporation; therefore, Delaware also has an interest in protecting parent companies who choose to incorporate in Delaware.  Third, Las Vegas Sands is a Nevada company and the parties chose Nevada law to govern their License Agreement; therefore Nevada has an interest in this dispute as well.

In analyzing which state has the strongest interest in this dispute, the Court finds significant the fact that the Sands mark was licensed to a New Jersey company for use in Atlantic City, New Jersey.  Moreover, while Atlantic is a Delaware corporation, its principal place of business is Atlantic City, New Jersey.  These contacts weigh in favor of applying New Jersey law rather than Nevada or Delaware law.

Accordingly, the Court holds that New Jersey law applies to the alter ego / veil piercing issue.

*Veil-piercing under New Jersey law*

---

Jersey courts apply New Jersey law.  *See Curtis T. Bedwell and Sons, Inc. v. Geppert Bros., Inc.*, 655 A.2d 483, 395 (App. Div. 1995).  While Las Vegas Sands asserts that there is a true conflict between New Jersey law and Nevada law, it asserts it should prevail under either standard, and therefore does not engage in the full conflict analysis.  Accordingly, this Court assumes a true conflict exists, but notes that even if a conflict does not exist, following *Geppert Bros.*, New Jersey law would apply.

Under New Jersey law, the separate corporate existence of a company, and the limited liability of its shareholders, are "fundamental propositions." *State Dept. of Envtl. Prot. v. Ventron Corp.,* 94 N.J. 473, 500 (1983).

> Even in the case of a parent corporation and its wholly-owned subsidiary, limited liability normally will not be abrogated.
>
> Except in cases of fraud, injustice, or the like, courts will not pierce a corporate veil. The purpose of the doctrine of piercing the corporate veil is to prevent an independent corporation from being used to defeat the ends of justice, to perpetrate fraud, to accomplish a crime, or otherwise to evade the law.
>
> Under certain circumstances, courts may pierce the corporate veil by finding that a subsidiary was a mere instrumentality of the parent corporation. Application of this principle depends on a finding that the parent so dominated the subsidiary that it had no separate existence but was merely a conduit for the parent. Even in the presence of corporate dominance, liability generally is imposed only when the parent has abused the privilege of incorporation by using the subsidiary to perpetrate a fraud or injustice, or otherwise to circumvent the law.

*Id.* at 500-01 (internal citations and quotations omitted). Thus, "the corporate veil may be pierced only where (1) 'the parent so dominated the subsidiary that it had no separate existence but was merely a conduit for the parent' and (2) 'the parent has abused the privilege of incorporation by using the subsidiary to perpetrate a fraud or injustice, or otherwise to circumvent the law.'" *Craig v. Lake Asbestos of Quebec, Ltd.*, 843 F.2d 145, 149 (3d Cir. 1988) (quoting *Ventron*); *see also Verni ex rel. Burstein v. Harry M. Stevens, Inc. of New Jersey,* 387 N.J. Super. 160, 200

32

(App. Div. 2006).[31]

With regard to the first prong of the analysis, the New Jersey Supreme Court and the Third Circuit have made clear that even a parent's "significant control" of its subsidiary is insufficient to pierce the corporate veil of the subsidiary; "'*complete domination*'" of the subsidiary is the key.  *Craig,* 843 F.2d at 150 (discussing *Ventron* and quoting *Fletcher, Cyclopedia of the Law of Private Corporations*; emphasis added).  "In determining corporate dominance, courts engage in a fact-specific inquiry considering whether the subsidiary was grossly undercapitalized, the day-to-day involvement of the parent's directors, officers and personnel, and whether the subsidiary fails to observe corporate formalities, pays no dividends, is insolvent, lacks corporate records, or is merely a facade." *Verni*, 387 N.J. Super. at 200 (internal citations omitted); *see also, Craig,* 843 F.2d at 150.

Las Vegas Sands' evidence establishes none of these factors. While it argues that in September, 2006, "ACE reported that its assets only exceeded its liabilities by $1 million" (Las Vegas Sands' Opposition Brief, p. 16), this fact, if true, does not establish inadequate capitalization for two reasons.  First, "'[t]he adequacy of capital is to be measured as of the time of formation of the corporation.  A corporation that was adequately

---

[31]   *Cert. denied,* 189 N.J. 429 (2007).

capitalized when formed, but subsequently suffers financial reverse is not undercapitalized.'" *Verni,* 387 N.J. at 200 (quoting *Fletcher*).  Here, there is no record evidence that ACE was undercapitalized *when it was formed* in 2003.  Its financial health in 2006 does little to answer the question of "'whether the corporation was established to defraud its creditors or [for] [an]other improper purpose such as avoiding the risks known to be attendant to a type of business.'" *Id.* (quoting *Trs of the Nat'l Elevator Indust. Pension, Health Benefit & Educ. Funds v. Lutyk*, 332 F.3d 188, 193 (3d Cir. 2003)).

Second, "[a]dequate capitalization is a question of fact that turns on the nature of the business of the particular corporation," *Verni,* 387 N.J. Super. at 200, yet Las Vegas Sands has produced no evidence as to the level of capitalization required to operate a casino and hotel such as the Atlantic City Sands.  Without such information, no reasonable factfinder could come to any conclusion as to the adequacy or inadequacy of ACE's capitalization.

Las Vegas Sands' evidence also fails to establish the requisite day-to-day involvement of Atlantic's directors or officers in ACE's operations.  Las Vegas Sands relies on Atlantic City Sands' President (i.e., ACE employee) George Toth's Employment Agreement, executed by Toth and *Atlantic* (not ACE), which requires him to "report to and be under the supervision of"

34

Atlantic's President and CEO.  (Crutchlow Ex. 63)  Of course, the
fact that Mr. Toth's Employment Agreement states that he must
report to Atlantic's President and CEO does little to prove
whether Mr. Toth actually did "report" to Atlantic, much less the
frequency and depth of any such reports.  Moreover, supervision
is simply not tantamount to dominance.  *See Craig,* 843 F.2d at
150 ("It is patently clear since *Ventron* that in New Jersey even
the exercise of significant control by the parent over the
subsidiary will not suffice to pierce the corporate veil.");
*Verni*, 387 N.J. Super. at 202 ("some degree of interdependence
and integration between the parent corporation and the
subsidiar[y] . . . does not establish corporate dominance.").[32]

Nor does the fact that ACE and Atlantic had three
overlapping officers suffice to establish day-to-day involvement.
*See Verni,* 387 N.J. Super. at 201 ("a parent's domination or
control of its subsidiary cannot be established by overlapping
boards of directors.") (internal citation and quotation omitted);
*Craig,* 843 F.2d at 150 (noting that in *Ventron* all of the
subsidiary's directors were officers of the parent, yet the New
Jersey Supreme Court held that domination had not been
established).

---

[32]   Similarly, the fact that Atlantic "as sole member of ACE"
executed employment agreements with Toth and one other ACE
employee (Crutchlow Ex. 63) cannot establish the requisite
dominance.

Lastly, Las Vegas Sands presents no evidence that ACE's and Atlantic's funds were comingled.  It relies on evidence that Atlantic borrowed money "to be used for working capital purposes in the operation of the Sands located in Atlantic City" (Crutchlow Ex. BB), and that ACE's quarterly financial report to the CCC incorporates by reference Atlantic's financial statements.  Neither of these facts support a conclusion that funds were comingled or that ACE and Atlantic failed to observe corporate formalities.  *See Verni,* 387 N.J. Super. at 202 ("centralized bookkeeping and accounting functions, without evidence of comingling, is not in derogation of the separate existence of the subsidiar[y].").  To the contrary, it is undisputed that ACE was the guarantor for Atlantic's loan (Crutchlow Ex. BB), supporting the conclusion that the entities maintained separate finances.  And perhaps most relevant to the current dispute, there is no evidence that Atlantic, rather than ACE, paid the royalties due under the License Agreement.

For all of these reasons, Las Vegas Sands' evidence falls far short of establishing Atlantic's dominance of ACE.  This holding alone is sufficient to deny Las Vegas Sands' motion for summary judgment and grant Atlantic's motion for summary judgment.  However, Las Vegas Sands' evidence also does not establish the second prong of the alter ego analysis.

"'The hallmarks of [the] abuse [of the corporate form] are

36

typically the engagement of the subsidiary in no independent business of its own but exclusively the performance of a service for the parent and, *even more importantly*, the undercapitalization of the subsidiary rendering it judgment-proof.'" *Verni*, 387 N.J. Super. at 203 (quoting *OTR Assoc. v. IBC Servs., Inc.,* 353 N.J. Super. 48, 52 (App. Div. 2002)) (emphasis added).

The Court has already held that the record evidence does not establish ACE's undercapitalization. In a related argument, Las Vegas Sands argues that it will suffer injustice absent piercing ACE's corporate veil, because ACE lacks sufficient funds to pay the judgment in this case. But the former does not necessarily follow from the latter. Even if ACE lacks sufficient funds to pay the judgment,[33] there is no evidence that ACE's financial state resulted from abuse of the corporate form. *Cf. Verni,* 387 N.J. Super. at 203 ("there is . . . no evidence that [the parent] . . . created [the subsidiary] as a judgment-proof corporation for the sole purpose of insulating it from liability."); *contrast OTR Assoc.,* 353 N.J. Super. at 54-55 (holding that piercing the corporate veil was appropriate where the subsidiary "was created as a judgment-proof corporation for the sole purpose of

---

[33]  Atlantic asserts that "ACE's assets clearly exceed any potential claim that plaintiffs assert in this action." (Atlantic's Reply Brief, p. 3)

insulating [the parent] from liability").[34]

Accordingly, the Court holds that Las Vegas Sands has also failed to put forth sufficient evidence supporting the second element of the alter ego analysis.

With regard to the veil piercing claim, Las Vegas Sands' motion for summary judgment will be denied, and Atlantic's motion for summary judgment will be granted.


**2.**

Las Vegas Sands also argues that Atlantic should be liable under an agency theory.  With respect to the choice of law issue, the Court applies New Jersey law for the same reasons discussed above.

Las Vegas Sands points to no evidence from which a reasonable factfinder could conclude that ACE was acting as Atlantic's agent when it signed the License Agreement.  Certainly the parent-subsidiary relationship between Atlantic and ACE, alone, is insufficient evidence of an agency relationship.  "It is well-established that '[a]n agency relationship is created when one party consents to have another act on its behalf, with

---

[34] *See generally Fletcher,* § 41.45 ("an injured party is not entitled to pierce the corporate veil of a parent corporation where its subsidiary corporation is not a shell for the parent. Similarly, the corporate form will not be disregarded merely because the corporation's assets and insurance are insufficient to assure recovery by a plaintiff.").

the principal controlling and directing the acts of the agent.'"
*Kernan v. One Wash. Park Urban Renewal Assocs.*, 154 N.J. 437, 453
(1998) (quoting *Sears Mortgage Corp. v. Rose*, 134 N.J. 326, 337
(1993)).  There is absolutely no evidence in the record that
could support a finding that Atlantic agreed-- either explicitly
or implicitly-- to have ACE act on its behalf when ACE entered
into the License Agreement.  Accordingly, with respect to the
agency claim, Las Vegas Sands' motion for summary judgment will
be denied, and Atlantic's motion for summary judgment will be
granted.

## IV.

        For the foregoing reasons, (1) ACE's motion for summary
Judgment against Las Vegas Sands will be denied; Las Vegas Sands'
cross-motion will be granted; and (2) Las Vegas Sands' motion for
summary judgment against Atlantic will be denied; Atlantic's
cross-motion will be granted.  An appropriate order accompanies
this Opinion.


Dated: May 24, 2010

                                  s/ Joseph E. Irenas
                         **Joseph E. Irenas, S.U.S.D.J.**